IN THE UNITED STATES COURT FOR THE DISTRICT OF UTAH

CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>　　　　Plaintiff,<br><br><br><br>　　　　　　vs.<br><br><br>LARRY ELY RAMIREZ,<br><br>　　　　Defendant. | MEMORANDUM DECISION AND ORDER DENYING DEFENDANT'S MOTION TO SUPPRESS<br><br><br><br><br>Case No. 2:06-CR-758 TS |

I. INTRODUCTION

The government has the burden to prove the exigent circumstances exception to warrantless entry into a home and to prove that a suspect's statements are voluntary.  The government has met those burdens in this case and accordingly the Court will deny Defendant's Motion to Suppress evidence found in his home and his statements.

II. FINDINGS OF FACT

At about 2:30 a.m. on February 28, 2003, Sergeant Newbold[1] of the West Valley City police had just finished his patrol shift when he heard dispatch call for officers at an

---

[1]By the time of the evidentiary hearing, Newbold had been promoted.  To avoid confusion, the Court will refer to him by his title at the time of the warrantless entry.

address near his location.  He responded because he was so near the address.  Dispatch reported a robbery of a case of Budweiser beer with a threat of a gun at an Albertson's grocery store, and further reported that the possibly intoxicated male suspect left the store in a white Cadillac with a specified license plate.

Sergeant Newbold patrolled the vicinity and, at 2:55 a.m., located the suspect vehicle parked in front of Defendant's home.  Sergeant Newbold knew Defendant from an earlier traffic stop.  He was also familiar with the home because he had received a tip from a confidential informant (CI) that Defendant was selling drugs from his home.  After having received the tip from the CI, Sergeant Newbold had checked Defendant's criminal history and driven by the home about forty times to observe activity.

When he located the suspect vehicle, Sergeant Newbold called for backup.  While he waited, he put on a raid vest because dispatch had reported a possible armed robbery and a possibly intoxicated suspect.

Defendant's house is half of a small two story duplex located on a dead end circular street with only one entrance.  When the backup officers arrived, they checked Defendant's criminal history and found an extensive criminal history of violent offenses, including aggravated assaults, assaults with a weapon and numerous drug and alcohol related offenses.  The officers set up a staging area near the only street exit and decided on the following plan: set up a containment area around the house; telephone inside the house and have the individuals come out, further investigate, and then obtain a warrant if needed. They initially decided not to knock for officer safety reasons.

Accordingly, the officers secured the perimeter with officers covering the front and back entrances.  Dispatch attempted unsuccessfully to telephone the house and its occupants and eventually learned that there was no telephone line into the house.

Unable to contact the occupants by telephone, they then determined to make contact and moved their perimeter line closer.  Sergeant Newbold and several other officers went through an open gate in a chain link fence to the back yard.  The officers included one with a K-9 to assist in case the suspect fled.  The backdoor was within a few brick's width of the corner of the home, with nowhere for the officers to conceal themselves and still monitor the door.  As a result, the officers placed themselves where they could see and control the situation with the closest being approximately three feet from the backdoor and the others four to five feet from the backdoor.

The backdoor was a sliding glass door and was opened four to six inches and partially covered with vertical blinds.  Through the opened door, Sergeant Newbold could see two males and a female seated at a table playing cards and drinking Budweiser beer.

As they waited for an officer to knock on the front door, Sergeant Newbold saw a third male suddenly appear and run first to the front of the house and then back into the kitchen. One of the occupants put his hand up to the back window and looked out.  The Sergeant, standing in uniform and displaying a badge, believed that he had been seen but wasn't sure if he could be identified as an officer.  So he slid the door open and from outside, said, "Police" and told the occupants to get on the floor.  Rather than complying, Defendant remained seated while another seated occupant ran to a nook or corner. Fearing that the running individual was attempting to reach a weapon, Sergeant Newbold

3

drew his weapon and stepped into the kitchen, followed by Deputy Lang, both yelling at the occupants to get on the floor.

The Deputy ordered Defendant to show his hands.  Instead, Defendant fumbled his hands by his waistband, raising a fear of officer safety because (1) the robbery report had included a threat of a gun; and (2) in the officer's experience, a waistband was where individuals typically kept guns.   The Deputy repeated the direction to show hands several times and Defendant failed to comply.  Newbold heard the change in the Deputy's tone as Defendant failed to comply and looked over to see Defendant start to go down and then saw him suddenly stand up and run out of the room.  Newbold followed and they briefly struggled on the stairs with Defendant attempting to kick the officer and then running into the upstairs bathroom.

Defendant was eventually detained and handcuffed by two officers in a scuffle in a bathtub in the upstairs bathroom.  During the scuffle, Defendant and the Deputy fought, Defendant tugged on the Deputy's weapon, and then the Deputy hit Defendant several times in the head.  After being handcuffed, Defendant was brought downstairs bleeding from his nose and was given a medical assessment.  He was transported to the hospital, but the record does not contain evidence of his treatment or the nature or severity of any injuries.

After Defendant was removed from the home, another Detective was asked to assist in obtaining a telephonic search warrant.  No search was made before the warrant was issued.  The warrant authorized a search for "Firearms, fruits or instruments of the crime

4

of aggravated robbery."[2]   The searching officers understood the warrant to also cover ammunition.  During the search the officers found a box of ammunition in a coffee can in the kitchen.

Detective Coleman was assigned to the Albertson's robbery.  When he got a call regarding a potential suspect, he went to Defendant's house, but arrived after the entry. He returned to the station where he interviewed two individuals regarding the robbery.  One admitted to being a passenger in the Cadillac with another individual, not Defendant, who had gone into Albertson's and returned with beer. The two had then driven over to Defendant's house to drink the beer.

Around 6:30 or 7:00 in the morning, Sergeant Newbold called Detective Coleman and told him that ammunition had been discovered during the search, that Defendant was the owner of the home, and that Defendant was in a holding cell.  Sergeant Newbold asked Coleman to have Defendant released and also to ask him about the ammunition.

Deputy Coleman removed Defendant from his holding cell,  removed his handcuffs, told him he was free to go, and asked if he wanted a ride.  Defendant said he would like a ride home.  The Deputy arranged for another officer to give him a ride home and went outside with Defendant to the police parking lot to wait for the ride.  While they waited outside for a few minutes for the ride, Deputy Coleman asked Defendant if he thought the officers would find a weapon in the house.  Defendant responded that the searching officers would not find a gun.  Deputy Coleman asked Defendant "if he didn't have any

---

[2]Pl.'s Ex. 5.

guns at his home, why would he have ammunition at his home.[3]  Defendant responded that "the ammunition was not for the gun that he owned, but he had found the ammunition and believed it may fit [his associate's] firearm."[4]  Deputy Coleman asked him where he kept the bullets and Defendant responded that they were in the kitchen in a Star Wars can.  The conversation was very brief and was ended by the arrival of Defendant's ride.  Deputy Coleman did not administer a *Miranda* warning.

### III.  DISCUSSION AND CONCLUSIONS

As an initial matter, Defendant reserves issues relating to the issuance of the telephonic search warrant until a tape or transcript can be obtained.[5]

Defendant moves to suppress his statements and any physical evidence seized from his person or home on the grounds that entry of his home was illegal, that the statements were the result of an illegal search and arrest, and that the statements were obtained in violation of *Miranda v. Arizona*.[6]  The government argues that the officers' entrance into the house was justified by exigent circumstances, the search of the house was within the scope of the search warrant, and the statements are admissible because they were voluntarily made at a time when Defendant was no longer in custody.

---

[3]Trans. at 121.

[4]*Id.*

[5]Docket No. 30, Def.'s Mem. at 14 and 15.

[6]384 U.S. 436 (1966).

Turning first to the issue of the warrantless entry into the home, the Supreme Court recently examined the issue in *Brigham City v. Stuart*,[7] and the controlling case law was recently summarized by the Tenth Circuit in *United States v. Layman*:

> Warrantless searches and seizures inside a home are presumptively unreasonable. Nevertheless, the warrant requirement is subject to certain exceptions. We have previously recognized the exigent circumstances exception to a warrantless entry "when the circumstances posed a significant risk to the safety of a police officer or a third party." This exception applies if (1) the officers had an objectively reasonable basis to believe an immediate need to enter existed to protect the safety of themselves or others, and (2) the conduct of the entry was otherwise reasonable. The Government has the burden of proving both prongs of the two-part test.
>
> Under the first prong of the exigent circumstances exception to the warrant requirement, we evaluate whether the officers had reasonable grounds to believe an immediate need to enter existed "guided by the realities of the situation presented by the record from the viewpoint of prudent, cautious, and trained officers." This inquiry is one of reasonable belief.
>
> * * *
>
> *Brigham City* is not dispositive. The exigent circumstances exception does not require officers actually see someone inside in immediate danger, as long as they have an objectively reasonable basis for believing that someone might be in danger, including themselves.[8]

"Law enforcement may not, . . . create their own exigencies to avoid the necessity of a warrant to enter a person's home."[9]

---

[7] --- U.S. ----, 126 S.Ct. 1943 (2006).

[8] *United States v. Layman*, No. 06-7124, 2007 WL 2137128, at *3-4 (10th Cir. July 26, 2007) (quoting *United States v. Najar*, 451 F.3d 710, 717 (10th Cir. 2006)) (other citations omitted).

[9] *United States v. Castro*, 225 Fed. Appx. 755, 758 (10th Cir. 2007) (citing *United States v. Bonitz*, 826 F.2d 954, 957 (10th Cir. 1987)).

In this case, the officers were faced with an unknown number of individuals in a home they were surrounding for the purpose of apprehending a potentially dangerous suspect.  The vehicle reportedly driven by the robbery suspect was parked in front of the home. They had probable cause to believe the suspect was in the house and was armed. The officers had information that the homeowner had a long history of violent crimes, some involving weapons.  The officers were standing a reasonable distance from the door.  The officers did not know the relationship of the rest of the individuals to the suspect.

The situation became suddenly volatile once the home's occupants suddenly began to move.  Reasonably believing that the home's occupants had seen them, and knowing they likely included an armed suspect, Sergeant Newbold quickly and reasonably acted in the interest of officer safety by fully opening the already partially opened door and directing the participants to the ground.  This intrusion of his hand into the door was not for the purpose of a search, but was an officer safety response to a sudden, volatile, and potentially dangerous encounter.[10]

Considering the above standard, the Court finds that once all of the occupants failed to comply and one instead ran to a nook or corner, the Sergeant had an objectively reasonable basis to believe there was an immediate need to enter to protect the safety of the officers.  There was an equally real possibility of danger from either being mistaken as

---

[10]*See Reeves v. Churchich*, 484 F.3d 1244, 1255-59 (10th Cir. 2007) (in § 1983 case holding that officer's insertion of rifle inside open window was not a search as it did not possess sensory capabilities and its insertion was not for the purposes of obtaining information).

intruders, or from being recognized by the potentially armed and intoxicated suspect as officers there to apprehend him.

The Court finds that the conduct of the entry was otherwise reasonable.  The officers' display of weapons ready for immediate use was reasonable where in the course of attempting to apprehend a potentially armed suspect, and having identified themselves as police, they encountered an individual who did not comply and instead suddenly moved to an area of the room that could conceal a weapon.  The chase after the Defendant when he ran from the room was the result of his own action in failing to respond to the legitimate and repeated requests to get on the ground and keep his hands in sight.

The Court finds that the entry was not for the purpose of securing evidence.  In fact before being overtaken by events, Sergeant Newbold at the back door had no intent to enter the home but instead intended to secure the perimeter and any persons who attempted to flee. In sum, the Court finds that the government has met its burden of establishing the exigent circumstances exception to a warrantless entry.

The Court turns next to Defendant's argument that the evidence of the ammunition was obtained through the warrantless entry.  The record shows that the officers did not search the house after the warrantless entry.  Instead, they secured the premises, took three individuals to the police station to be questioned, and obtained a telephonic search warrant.  Recognizing that the Defendant has reserved any issue relating to the transcript of the phone call seeking the telephonic warrant, the Court finds that as the government has met its burden of showing that the warrantless entry was justified by the exigent circumstances exception, and, therefore, was not in violation of the Fourth Amendment,

9

it does not follow that any evidence obtained thereby must be suppressed as fruit of a poisonous tree.

Next, the Court addresses Defendant's contention that his statement was obtained in violation of *Miranda*. Defendant contends that he was in custody when the statement was given. He contends that he was severely injured and waiting for a ride and therefore was not free to leave when the questions were asked. The government contends that Defendant was no longer in custody, was told he was free to go, and his statements were voluntary.

> In *Miranda v. Arizona*, the Supreme Court concluded that "the process of in-custody interrogation of persons suspected or accused of crime contains inherently compelling pressures which work . . . to compel him to speak where he would not otherwise do so freely." To guard against this danger, the Court requires that "the accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored." Absent these specific warnings, there is "a presumption of coercion" for custodial confessions "that is generally irrebuttable for purposes of the prosecution's case in chief."[11]

A person is "in custody" for purposes of Miranda only if "a reasonable person in the suspect's position would have understood his situation as the functional equivalent of formal arrest."[12]

The Court finds that Defendant was no longer in custody when he made the statements. He was told he was released, clearly told he was free to go, was physically

---

[11]*U.S. v. Carrizales-Toledo,* 454 F.3d 1142, 1148 (10th Cir. 2006) (quoting *Miranda*, 384 U.S. at 467 and *United States v. Patane*, 542 U.S. 630, 639 (2004)).

[12]*United States v. Ellick*, No. 97-2163, 1998 WL 794971, at *5 (10th Cir. Nov. 16, 1998) (quoting *Berkemer v. McCarty*, 468 U.S. 420, 442 (1984)).

escorted out of the police station, was offered a ride home, and was standing outside the police station when the statements were made.  It could not have been made clearer to him that he was no longer in custody and was free to go about his business.  "The critical point is whether [the suspect] was in custody *at the time of the conversation*."[13]

The Court next examines whether the statements were voluntary.

> In determining whether a particular confession is coerced, we consider the following factors: (1) the age, intelligence, and education of the defendant; (2) the length of the detention; (3) the length and nature of the questioning; (4) whether the defendant was advised of her constitutional rights; and (5) whether the defendant was subjected to physical punishment. The determination of voluntariness is based on the totality-of-the-circumstances; none of the single factors listed above is determinative.  Accordingly, this court must be mindful of all of the circumstances surrounding a defendant's interrogation, including the particular defendant's characteristics.[14]

In the present case, the Defendant is an adult, thoroughly familiar with the criminal justice system.  He was detained, at most, three to four hours in a holding cell at the police station, not the jail.  He was then told he was free to go, and was physically escorted out of the building into the public space of a parking lot.  The length of questioning was very brief—only a few moments and only two questions.  The officer who asked the questions was not in uniform and Defendant had not dealt with him previously.  There is no evidence of coercive questioning, a show of force, or anything else by Detective Coleman that would have affected the voluntariness of the statements.

---

[13]*United States v. Glover*, 104 F.3d 1570, 1579 n.5 (10th Cir. 1997).

[14]*Id.* at 1579 (quoting and citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)).

Defendant argues that where there was lack of medical attention and the Defendant was severely injured and waiting to be driven home, no reasonable person would have felt free to leave.  However, the record in this proceeding does not show a lack of medical attention, or the nature and extent of any injuries except (1) the bloody nose following the fight in the bathtub, and (2) Detective Coleman's observation that there appeared to be some sort of a visible injury.  However, Detective Coleman also testified that Defendant did not have difficulty talking, did not ask for any assistance, and did not mention any discomfort.

Viewing the totality of the circumstances, the Court finds that Defendant's statements were voluntary.

## IV. ORDER

Based upon the foregoing it is the therefore

ORDERED that Defendant's Motion to Suppress (Docket No. 11) is DENIED.  It is further

ORDERED that the time from the filing of the Motion to Suppress through the date of the new trial is excluded from the computation of the Speedy Trial Act time pursuant to 18 U.S.C. § 3161(h)(1)(F).

DATED  August 7, 2007.

BY THE COURT:

_____

TED STEWART
United States District Judge

12